**TAYLOR et al. v. McDANIELS.**

No. 18772.. Opinion Filed Sept. 24, 1929.

Rehearing Denied Nov. 12, 1929.

Rainey, Flynn, Green & Anderson, for plaintiffs in error.

Champion, Champion & Fischl, for defendant in error.

ANDREWS, J. Isom McDaniels, who for a long time had been an engineer employed by the Gulf, Colorado & Santa Fe Railway Company, was discharged by that company on July 15, 1923, by E. E. Taylor, division superintendent, on account of the conduct of McDaniels. C. H. Van Fleet was given the position formerly held by McDaniels. Crawford was the representative of the Brotherhood of Locomotive Engineers as chairman of adjustments and maintained his headquarters at Cleburne, Texas. McDaniels was a member of the Brotherhood of Locomotive Engineers. After the discharge McDaniels requested Crawford to write to Taylor and try to get McDaniels reinstated in the service. Crawford had considerable correspondence with Taylor and tried industriously to have McDaniels reinstated with the company on a basis of leniency. He represented McDaniels at an investigation held by the company at Ardmore, Okla. McDaniels also had other friends intercede in his behalf and communicate with Taylor and the company with reference thereto. McDaniels also wrote a number of letters and "importuned Mr. Crawford" practically every time he saw him to be reinstated.

On February 17, 1924, Taylor, for the railway company, in answer to a letter from Crawford concerning the reinstatement of McDaniels, wrote Crawford a letter containing a statement which is the basis of this litigation, as follows:

"During our conference, I did not detect anything irregular in his conversation, but unquestionably the man's mind is affected. This seems to be the opinion of others who have expressed themselves to me."

And on July 12, 1924, in response to another request, wrote another letter containing a similar statement, as follows:

"I think we will have to agree that his mind is either affected or he has a vicious temper, either of which would make him an undesirable employee, in that he was unable or didn't have any control whatever over his temper. Personally I am firmly of the opinion from information gained in talking to employees that his mind is affected."

The first letter was mailed from Cleburne, Texas, to Cleburne, Texas, and the second from Cleburne, Texas, to Gainesville, Texas. Thereafter McDaniels made a request to the engineer division at Cleburne to have Crawford appear before the division and bring his files, which request was communicated to Crawford. Crawford did not appear, but sent his files to the division in January, 1925. McDaniels first saw the letter of July 12, 1924, while the files were in the possession of the secretary of the lodge at Cleburne and about March, 1925. He procured it from the office of Crawford after the return of the files from Cleburne.

McDaniels then instituted a suit in the district court of Carter county against Taylor, Van Fleet, and the railway company, charging a conspiracy to injure him and libel in the publication of the statements contained in the letters.

The trial court found and instructed the jury that there was no evidence of conspiracy and that feature of the case will not be discussed further.

The allegations of libel in the petition were so interwoven with the allegations of conspiracy in a wrongful discharge from employment that it makes it difficult to separate the two. The trial court, in support of the allegations of conspiracy, permitted evidence to be introduced of McDaniels' connection with the railway company from his first employment up to and including his third discharge and permitted testimony of his failure to procure other employment after the date of his discharge and prior to the date of the writing of either of the letters complained of. This was proper under the allegations of conspiracy, but had no relation to the charge of libel. When the court found that there was no evidence of conspiracy, this testimony was left in the record and no doubt had some influence with the jurors.

It appears from the evidence that McDaniels was unable to procure employment with other railway companies, but there is nothing in the evidence to indicate that that failure was due to the two letters complained of and all the evidence indicates that it was due to the fact that he had been three times discharged by the railway company. McDaniels testified that he had made repeated

efforts to procure 'employment with other railway companies after his last discharge, but there is nothing in the record to indicate whether those attempts were before or after February 17, 1924, and this court is unable to say that these attempts were not made between the date of the last discharge on July 15, 1923, and February 17, 1924, the date of the first letter. At least there is no testimony that McDaniels ever made any attempt to procure employment with any other railway company after February 17, 1924.

The court permitted the introduction of a number of letters, over the objection of the defendants, among which we refer to one of McDaniels to Taylor dated November 1, 1923, and which contained many self-serving declarations and which was so worded as to undoubtedly enlist the sympathy of the jurors for this man who had been discharged by the railway company.

This court is unable to determine just what effect this incompetent testimony had upon the minds of the jurors, but there is no doubt that it had some effect as disclosed by the record.

At the conclusion of the evidence of the plaintiff, the defendant Van Fleet demurred generally thereto, and the following transaction thereupon took place:

"By the Court: What do you say to that? By Mr. Fischl: I think it is good. By the Court: All right, I will sustain the demurrer as to Mr. Van Fleet. By Mr. Green: Comes now the defendant at this time, and moves the court that they be given an opportunity to prepare a petition and bond for removal in this case to the federal court, for the reason that it now appears for the first time that there is a diversity of citizenship existing between the defendants, E. E. Taylor and the Gulf, Colorado, & Santa Fe Railway Company, and the plaintiff, McDaniels. By the Court: What do you say to that, Mr. Fischl? By Mr. Fischl: It has never been raised, if the court please. They voluntarily entered their appearance in this court without being served. By the Court: What do you say, Mr. Green? As a lawyer, will you state to me frankly that you think your motion is any good? By Mr. Green: I do. By the Court: Why did you think about that after you had proceeded to come down here, and after they had offered all of their testimony? By Mr. Green: Because there is a defendant in this case, Mr. Van Fleet, who was a resident of this state at the time this suit was brought, and because personal service was had upon him, and thereby the controversy was not one of diversity of citizenship. It appears now that for the first time there is a diversity of citizenship. By the Court: Let the record show that I withdraw the former ruling and overrule the demurrer as to this man Van Fleet."

At the conclusion of all of the testimony, Van Fleet asked for a directed verdict, which was overruled. Thereupon the court instructed the jury that the evidence was insufficient to show any conspiracy. There had been no evidence introduced in this case connecting Van Fleet with the libelous matter in any way and the only evidence as to Van Fleet was to show that he had been given the position formerly held by McDaniels. Yet, notwithstanding this fact, the jury returned a verdict against Van Fleet along with the other defendants and for the same amount. The trial court rendered a judgment against Van Fleet as well as the other defendants. It is true that the trial court thereafter granted Van Fleet a new trial, but this abstract of the record is sufficient to show that this jury did not give proper consideration to this case or no verdict would have been rendered against Van Fleet. The trial court committed error in overruling the demurrer of Van Fleet to the testimony of the plaintiff. While Van Fleet is not a party to the appeal, this statement is made for the purpose of showing the effect upon the jury of the testimony admitted with reference to the discharge of plaintiff.

Careful reading of the record in this case discloses that the verdict was not caused by the writing or publication of the letters complained of, and that it was caused by sympathy of the jury for a man who had been discharged and who was unable to obtain similar employment.

As far as the trial of this case was concerned, it was wholly immaterial what compensation McDaniels was receiving in July, 1923, or that he was discharged in July, 1923.

Had the evidence in this case been confined to the conditions existing on the 17th day of February, 1924, and the facts occurring from and after that date, it is highly probable that the verdict of the jury would have been different.

Defendants Taylor and Gulf, Colorado & Santa Fe Railway Company appealed to this court, and will be hereinafter referred to as defendants. McDaniels will be hereinafter referred to as plaintiff.

The defendants present a number of questions. We think the determination of the first is sufficient, and the others will not be considered herein. That contention is that no publication of the alleged libelous

letter was proven. This contention is answered by plaintiff in five contentions, which will be hereinafter discussed.

The procedure for the trial is governed by sections 304, 305, and 498, C. O. S. 1921, which place the burden upon the plaintiff in a libel action: First, to state what the defamatory matter was; second, that it was published; and third, to state any general or special damages. The defendant need only deny and offer evidence to disprove the charges made unless he contends that the charges are true, which requires an affirmative allegation of the truthfulness thereof, or that it was a privileged communication, which requires an affirmative allegation thereof. Plaintiff must prove publication. Section 304, Id.

This court in Dawkins v. Billingsley, 69 Okla. 259, 172 Pac. 69, quotes with approval from 25 Cyc. 259, as follows:

" 'Publications imputing mere impairment of mental faculties or intellectual weakness not amounting to insanity are libelous per se'—citing Morse v. Times-R. Printing Co., 124 Iowa, 707, 100 N. W. 867; Belknap v. Ball, 83 Mich. 583, 47 N. W. 674, 11 L. R. A. 72, 21 Am. St. Rep. 622; Wood v. Boyle, 177 Pa. 620, 35 Atl. 853, 55 Am. St. Rep. 747; Candrian v. Miller, 98 Wis. 164, 73 N. W. 1004"
—and we agree with the trial court that the matter charged is libelous per se.

The defendants demurred to the petition of the plaintiff as amended and to the evidence of the plaintiff at its conclusion, and they requested the court to instruct the jury in favor of the defendants at the conclusion of all of the evidence. Thus there was squarely put in issue the publication of the alleged libel.

In American Railway Express Co. v. Morris, 129 Okla. 278, 264 Pac. 619, it was said:

"The defendant, by filing its demurrer in the lower court, insisted that the amended petition of the plaintiff failed to state a cause of action in favor of the plaintiff and against the defendant and in this contention we must agree."

While it is true that a demurrer admits the truth of a fact pleaded, it does not determine the truth of the inference of the pleader based on the facts pleaded unless the facts are sufficient to authorize such inference. Kee v. Armstrong-Byrd & Co., 75 Okla. 84, 182 Pac. 494.

This petition charged, and it was attempted to be proven, that publication was made in two manners: First, by delivering the instruments to Crawford; and, second, through Crawford's delivery of the instruments to the lodge.

The first question to be determined by this court is, Was the delivery to Crawford a publication?

The rule is stated in 17 R. C. L. 315, to be as follows:

"Defamatory words, uttered only to the person concerning whom they are spoken, no one else being present or within hearing, are not actionable, because it is necessary as an invariable rule that there be a publication of defamatory words to some one other than the person defamed to render the same actionable. The same principle applies to written or printed words in that they are not regarded as published, in the sense that they will support civil action, where the instrument containing them reaches the person only of whom they are written."

—and it is well supported by authorities. We do not consider it necessary to discuss that rule, but will confine our discussion to the extension thereof which, as stated on page 320, is as follows:

"It is generally held that the publication of a libel or slander invited or procured by the plaintiff is not sufficient to support an action for defamation. For example, the delivery of a letter of recommendation for a former employee to a person who, by his authority, requested it is not a publishing of any libel contained in it."

The rule is stated in 36 C. J. 1224, as follows:

"If plaintiff consented to, or authorized the publication complained of, he cannot recover for any injury sustained by reason of the publication; and the same rule applies to a publication solicited or induced by inquiry on the part of plaintiff or his agent, at least if it was procured by the fraudulent contrivance of plaintiff himself, with a view to an action."

And in 18 Am. & Eng. Ency. of Law (2nd Ed.) 1018, as follows:

"There is no such publication as will support an action where the speaking of the defamatory words or the writing or delivering of the defamatory matter is invited or procured by the plaintiff or a person acting for him in the matter, as, for instance, where words originally spoken to the plaintiff alone are subsequently, at his request, repeated by the defendant in the presence of a third person."

We quote from Irish-American Bank v. Bader (Minn.) 61 N. W. 327, as follows:

"It appears that Scallen, the cashier of the bank, was informed by one Boran that

there were rumors afloat that the bank had suspended, and that the report had originated with defendant. Thereupon Scallen suggested to Doran that they had better go and interview defendant, and 'see what there was about it,' and 'shut the thing off,' as it might start a run on the bank, and requested Doran to go along with him for that purpose. When they arrived at defendant's place of business, they opened a conversation with him in which they led him up to the subject of the condition of the bank. There is evidence tending to prove that in the course of this conversation defendant spoke some of the words charged. But there is no evidence that the words then spoken were addressed to or heard by anyone except Scallen and Doran. It also appears very clearly that whatever defendant said on that occasion was induced by Scallen and Doran themselves. Uttering slanderous words under such circumstances is not actionable. Scallen, the cashier, and his friend, Doran, who went with him at his request, must both be deemed as representing the bank, as respects that interview. The case is, in effect, one where words were uttered in the presence of the person slandered, only, and were so uttered at his instance."

And from Kansas City, M. & B. R. Co. v. Delaney (Tenn.) 52 S. W. 151, as follows:

"It will be observed that this suit is not to recover damages for the breach of a contract, or for discharging Delaney from the service of the company, but is for the publication of a libel based upon the following language in the letter, namely: 'Like many others, he left our service during the strike.' It will be remembered that this letter was written at the urgent solicitation of Mr. Speed, acting as the friend of Mr. Delaney. Neither Delaney nor Speed expressed any dissatisfaction with it at the time it was written, but received it and attempted to make use of it. The only publication of the letter was in making its contents known to Speed. No witness was produced who had refused to employ Delaney on account of the letter, nor were any special damages alleged or proved. There is no evidence of publication in this record. The proof is undisputed that this letter was written by Sullivan at the request of Mr. Speed, who was acting by authority of plaintiff. Speed accepted it, and delivered it to plaintiff, who used it in seeking employment. Under the authorities, the company is not liable for any of the consequences of the act of Delaney in making publication of the letter after it reached his hands. If a person receives a letter containing libelous matter, he will not be justified in publishing it. Sylvis v. Miller, 96 Tenn. 94, 33 S. W. 921; Wilcox v. Moon (Vt.) 24 Atl. 244. In view of the facts of this case, was the delivery of the letter by Sullivan to Speed a publication? Unquestionably not."

In that case, as in the case at bar, the plaintiff had been discharged by the railway company and no witness was produced who refused to employ plaintiff on account of the letter. The publication was to the agent of the plaintiff, which does not constitute publication at law.

In Ridgeway State Bank v. Bird (Wis.) 202 N. W. 170, Paul was the cashier of the bank. Rumors were afloat to the effect that he had wrongfully received money from the village in an electric light deal. On the trial he claimed that in order to ascertain the source of the rumors and fix the responsibility therefor he employed a detective agency to make an investigation. The detective agency sent two of its agents to call upon the defendant, and, while they made some investigation of the rumors against Paul, their principal effort was directed to procuring statements from the defendant concerning the bank. Paul testified that he did not hire these men as an officer of the bank, but only as an individual; that the bank had nothing to do with the hiring of the detective agency. The trial court held that the detectives were the agents of the bank and the statements made to them were as though made to the bank directly, and therefore there was no publication. The evidence as to whether the detectives represented Paul or the bank was conflicting and the Supreme Court held that there was error in not permitting the jury to determine whether the detectives acted as agents for the bank or as agents for Paul individually, and reversed the case, with directions to determine that question.

In the Texas case of Laughlin v. Schnitzer, 106 S. W. 908, the plaintiff had rented a house from the defendant. A few days afterward he sent his son to her to tell her to come and get her money back, that he did not want her in the house. A few days afterward she took a friend of hers and went to see the defendant and asked him what he meant by sending her that message. His reply to her in the presence and hearing of her friend was the basis for the action. The court said:

"No one heard it but the three persons. Mrs. Cuney testified substantially the same, and that defendant was very angry and talked very loud and insultingly toward plaintiff; that he was very rough. Plaintiff testified that the statements were false. It is contended that, as the language used by

267

defendant charged her with having committed an indictable offense, she could have a recovery regardless of the truth or falsity of the charge, and the charge allowing her to recover only if the charge was untrue was error. We are of the opinion that the answer of defendant to plaintiff's inquiry was, under the circumstances, and according to plaintiff's own proof, conditionally privileged. If it had been made to her alone, it would not have served as a basis for an action. In this case she went to defendant's store for the purpose of getting from him his reason for requiring her to quit the house, and instead of going alone took with her a third person. She asked for the reason in Mrs. Cuney's presence. If she did not know defendant's reason, she was willing for Mrs. Cuney to hear the reason, whatever it was. Upon these facts she could not recover for the mere expression of defendant's reason in Mrs. Cuney's presence. The facts present a qualified privilege. Billings v. Fairbanks, 139 Mass. 66, 29 N. E. 544. In Newell on Libel and Slander, sec. 116, the rule is stated from English cases that, if the only publication proved at the trial be one brought about by plaintiff's own contrivance, there is no sufficient evidence of publication. It is as though the only publication were to the plaintiff himself, and therefore he must be nonsuited. However, the rule, as it is now understood, is that a party may not take advantage of such a situation in order to gratify his malice, and therefore the plaintiff may recover even in such a case, upon proof of malice of defendant in making the statement, although prima facie the occasion made it privileged. Railway v. Richmond, 73 Tex. 575, 11 S. W. 555, 4 L. R. A. 280, 15 Am. St. Rep. 794; Railway v. Behee, 2 Tex. Civ. App. 107, 21 S. W. 384; Cranfill v. Hayden, 97 Tex. 544, 80 S. W. 609."

In Heller v. Howard, 11 Ill. App. 554, the plaintiff took a friend with her to the defendant to hear the defendant repeat the remarks he made about her. The court held that the same did not constitute a cause of action.

Plaintiff criticises these cases and says that they are different in fact and theory from the case at bar. We do not agree with this contention.

McDaniels had been discharged by the railway company three times. He was anxious to be reinstated and he procured the services of Crawford to intercede with the railway company in his behalf. Crawford did so, and in answer to Crawford's communication to Taylor the letters complained of were written. In effect they gave the reasons offered by Taylor as his excuse for refusing to extend leniency to McDaniels

or reinstate him. They were made to the agent of the plaintiff, and as such, under the law, were of the same effect as though made to the plaintiff himself. There was no publication.

It is contended by the plaintiff that the agency of Crawford was not alleged in the answer of the defendants nor asserted in the trial court. The record shows that during the trial the attorney for the defendants said:

"The end of this examination, Your Honor, is to show that this man's connection with the Brotherhood of Locomotive Engineers, of which McDaniels was a member; that he was acting as agent for McDaniels in his dealings with the company."

It can scarcely be said that the agency was not asserted in the trial court.

As to whether or not Crawford was the agent of the plaintiff, we quote from the testimony of the plaintiff, as follows:

"Q. After you were discharged, Mr. McDaniel, did you make any application to get reinstated? A. Yes, sir, through Mr. Crawford. Q.. Mr. Crawford, the gentleman that was on the stand a few moments ago? A. Yes, sir. Q. Did you enlist his assistance in trying to get reinstated? A. Yes sir, and also through Mr. Taylor. Q. Mr. Taylor, the defendant in this case? A. Yes, sir. Q. Now, Mr. McDaniel, did you go down and talk to Mr. Taylor? A. Yes, I had a talk with Mr. Taylor. Q. And you talked with Mr. Crawford? A. Yes, sir. Q. And did you talk with other members of the personnel of the Gulf, Colorado and Santa Fe Railway Company? A. Yes, sir. Q. Who else did you talk to in connection with the company? A. Oh, I will take that back. No, Mr. Taylor is the only man that I talked to. Q. Did you have some conversation—by the Witness: (interrupting) I talked, of course, to the representative of the organization, and some of the employees in person. Yes, to various employees. Q. Did you have your friends intercede in your beralf? A. Yes, sir. Q. Do you know whether they communicated with Mr. Taylor—with the company for you? A. Yes, they interceded for me, is my understanding. Just let me make a little correction. Mr. Crawford assisted me in getting that job with the Houston, Belt Terminal, and then it was stopped for some cause or other. Q. Now, you say that you were endeavoring to be reinstated for about a year? A. Something like that, I guess. Q. And you wrote a number of letters and importuned Mr. Crawford practically every time you saw him to be reinstated, didn't you? A. Yes, that is the custom. Q. About how many letters did you write him? A. Well, that

would be hard to estimate. Quite a few letters were exchanged between us. Q. He got you reinstated once or twice before this, didn't he? A. He got me reinstated. but I have a letter in the files where Mr. Taylor told him—Q. (Interrupting) I didn't ask you that—what Mr. Taylor told him. I asked you if Mr. Crawford got you reinstated once before? A. Yes, but Mr. Taylor wouldn't reinstate me. Q. Then you asked Mr. Crawford for the copy? A. For the original letter, and he turned me over his files. Q. Mr. Crawford was acting for you in all of those matters? A. Yes, sir. Q. And it was your request that these files be sent down to the lodge that you were a member of? A. Yes, sir."

It is unnecessary, under our statute, that the agency be alleged in the answer. This case does not turn on a question of agency, but on the question of publication. If the delivery of the letters was to the agent, then there was no publication at law, and the issue as to whether or not there was publication was raised by the general denial.

This disposes of the first and second contentions made by the plaintiff.

The third contention of plaintiff is that Crawford was not the agent of plaintiff, but the general chairman of the general committee of adjustments of the Brotherhood of Locomotive Engineers, and that his appeal for reinstatement of McDaniels was under and by virtue of the contract between the railway company and the brotherhood. This contention is not supported by the record. The contract provides:

"No engineer shall be discharged or held off duty. on any charge whatever. without first having a fair and impartial hearing and his guilt established. with the exception of aggravated cases. There shall be a board of inquiry composed of superintendent, division master mechanic. or their representatives and one disinterested engineer. to investigate promptly all charges of misconduct on the part of engineer."

It is clear that plaintiff had a right to a hearing before the board of inquiry. but there was no provision made that McDaniels should be on that board. It provided for "one disinterested engineer." The hearing had been had before the board of inquiry and the time to appeal had expired and the appeal of Crawford was for leniency to McDaniels.

We quote Crawford's testimony as follows:

"Q. You say there was not any formal appeal taken from this order of dismissal entered on the 15th day of July. 1923?

A. No, sir, no formal appeal was taken. Q. Then, you had no right at any time, Mr. Crawford, as I understand you under the rules and under the contract between the Brotherhood of Locomotive Engineers and the Gulf, Colorado & Santa Fe Railway Company to present this matter to Mr. Taylor, or to the railroad company, except on a leniency basis, had you? A. No, sir. Q. Just appealing from man to man? A. Appealing on the leniency proposition, which can be done at any time within six months limitation. Q. Had his time elapsed by operation of the contract? A. No. sir. Q. The time had elapsed to take an appeal? A. The time under that agreement. Q. And the railroad under that contract did not have to listen to you in the matter at that time, did it? A. No, we haven't any contract that will make them listen to a leniency appeal at any time. That is a matter of courtesy. Q. But they did listen to you—correspond with you? A. Yes, sir."

We think there is no merit in the fourth contention, that the communication to Taylor was not solicited by the plaintiff or Crawford.

The record shows the following testimony of Crawford:

"Q. Now, what was the occasion of the writing of this letter to you by Mr. Taylor? Had you written to Mr. Taylor? By Mr. Fischl: Objected to as improper cross-examination and not the best evidence. By the Court: Overruled. By Mr. Fischl: Save an exception. A. The letter and exhibit was a letter from Mr. Taylor in answer to a letter I had written to Mr. Taylor. Q. And tried industriously to get him reinstated? A. Yes, sir. Q. And somewhere about the 8th day of July, you wrote a letter asking for his reinstatement? A. Yes, sir. Q. And this letter was brought forth (indicating) from your letter? A. Yes, sir."

—as well as other testimony showing that the two letters were written in response to the communications received from Crawford.

With reference to the fifth contention, that Taylor knew that it was the duty of Crawford to report to the members of the brotherhood and that that knowledge charges the defendants with knowledge that Crawford would publish the letters, plaintiff contends that he first heard of the existence of the letters from Beard after Crawford had sent the file to the lodge at Cleburne.

This raises the other question to be determined in this case, as to whether or not there was a publication through the delivery of the letters by Crawford to the lodge at

Cleburne. We think there was none. The record shows that Crawford received the first letter in February, 1924, and the second in July, 1924. There is no showing that they were ever exhibited to anyone until January, 1925, when Crawford sent his file containing these letters to the lodge at Cleburne. If he had sent that file to the lodge at Cleburne of his own volition, there would be some merit in the plaintiff's contention in this respect, but this record shows that the file was sent by Crawford to the lodge at Cleburne, not of his own volition, but on the request of the lodge at Cleburne to Crawford. Why did the lodge at Cleburne make the request? That is clearly answered by the record.

Crawford testified:

"A. Well, along about that time, Mr. McDaniels made a request to the engineer division at Cleburne to have me appear before the division and bring my files, and I was busy at something else, and I sent my files up to the division. Q. In response to that letter, Mr. Crawford, did you furnish the secretary of the brotherhood at Cleburne with your file in this matter? A. Yes, sir. Q. Did that file contain this letter introduced in evidence here? A. Yes, sir."

And McDaniels testified concerning the lettters:

"A. I saw it some time in March after I learned of its existence—about the first of March. Q. What year? A. By letter. Q. What year—in March you say you learned of it by letter? A. Yes, sir; Mr. Beard at Cleburne at that time, wrote me about the existence of this letter. Q. And you asked the lodge now to have Mr. Crawford bring his files down? A. Yes, sir. Q. Then you asked Mr. Crawford for the copy? A. For the original letter, and he turned me over his files. Q. Mr. Crawford was acting for you in all of those matters? A. Yes, sir. Q. And it was your request that these files be sent down to the lodge that you were a member of? A. Yes, sir."

Crawford in forwarding the file to the lodge at Cleburne was acting as the agent of the plaintiff, and plaintiff cannot complain here of the acts of his agent .

Summarized, the facts in the case show that the plaintiff was discharged for the third time by the railway company; that he was granted a hearing and the discharge was sustained and no appeal was taken; therefrom; that after the expiration of the time for appeal he procured the services of Crawford for the purpose of securing reinstatement through the leniency of the railway company; Crawford, acting for the plaintiff, wrote Taylor requesting leniency and reinstatement, and Taylor in response to the .etter gave his reason for refusing to grant the request; Crawford kept the letters until plaintiff requested the lodge at Cleburne to have Crawford send them to the lodge at Cleburne, which Crawford did.

There was no publication in the forwarding of the letters from Taylor to Crawford, because that was done at the request of the agent of the plaintiff and in answer to the communication of the agent.

There was no publication in forwarding the letters from Crawford to the lodge at Cleburne, for that was done at the request of the plaintiff himself through the lodge at Cleburne, and that was the act of the agent of the plaintiff.

That there had been no legal publication was shown by the evidence of the plaintiff, and for that reason the court committed reversible error in overruling the demurrer of the defendants to the evidence of the plaintiff.

The cause is reversed, with directions to vacate the judgment, set aside the verdict, and sustain a demurrer to the evidence.

The cause is reversed, with directions to vacate the judgment, set aside the verdict, and sustain a demurrer to the evidence.

MASON, C. J., LESTER, V. C. J., and HUNT, CLARK, RILEY, HEFNER, and CULLISON, JJ., concur. SWINDALL, J., absent.

Note.—See (1) 17 R. C. L. 293; 3 R. C. L. Supp. p. 646; 4 R. C. L. Supp. p. 1115; 7 R. C. L. Supp. p. 565; (2) 17 R. C. L. 416; 3 R. C. L. Supp. p. 680; (3) 17 R. C. L. 320; 3 R. C. L. Supp. p. 653; 4 R. C. L. Supp. p. 1117, 5 R. C. L. p. 938; (4) Anno. 21 L. R. A. (N. S.) 33; (5) Anno. 15 L. R. A. (N. S.) 1141; 17 R. C. L. 320; 3 R. C. L. Supp. p. 563; 5 R. C. L. Supp. p. 938. See "Libel and Slander," 36 C. J. §47, p. 1172; n. 52; §171, p. 1224, n. 49; §215, p. 1246, n. 24, 26; §216, p. 1247, n. 43; 37 C. J. §354, p. 33, n. 76; §372, p. 41, n. 23; §466, p. 72, n. 11.