A. D. Wood *v.* P. C. Boyle, Appellant.

[Marked to be reported.]

*Libel—Character—Libelous publication per se.*

The following publication is libelous in itself: " W., the variously notorious young Napoleon of politics and pipe lines, will assemble his small brood at Warren this morning, and together vote on the proposition to turn over the Producers' Oil Company's real pipe line to the refiners and exporters doing business as the fake United States Pipe Line, a concern that exists on paper and subsists on wind. Mr. W. has accomplished some surprising things in his day. Without a following in politics, he has set up a political boss; without brains or capital or credit, he has appeared at the head of a gigantic business enterprise requiring liberal bank balances and a large mental endowment. He never yet has succeeded in anything he has undertaken involving the peace and prosperity of the community, for the excellent reason that he is invariably associated with movements

that ought not to succeed. We dare say that his scheme to steal a pipe line from the poor producers in order to give it to the opulent refiners and arrogant exporters masquerading as the United States Pipe Line, will fail, as it properly should."

*Libel—Privileged communication.*

A publication to the effect that the manager of a pipe line, engaged in a business of a public character, had set himself up as a political boss, without brains or capital or credit, and that he had entered into a scheme to steal a pipe line from the poor producers in order to give it to the opulent refiners, impeaches the private, individual and personal character of the manager, and not his official character, and therefore it is not a privileged communication.

*Libel—Injurious publication as to character.*

Any publication injurious to the social character of another, and not shown to be true, or to have been justifiably made, is actionable as a false and malicious libel.

*Practice, C. P.—Service of process—Privilege from arrest—Attendance at court.*

The defendant in a criminal case is not privileged from arrest on civil process while attending court to answer a criminal charge.

*Practice, C. P.—Death of plaintiff between verdict and judgment.*

Where the plaintiff in an action dies after the verdict, judgment may be entered within two terms after the verdict was rendered.

Argued May 5, 1896. Appeal, No. 278, Jan. T., 1896, by defendant, from judgment of C. P. Warren Co., March T., 1895, No. 6, on verdict for plaintiff. Before STERRETT, C. J., GREEN, WILLIAMS, MITCHELL and DEAN, JJ. Affirmed.

Trespass for libel. Before NOYES, P. J.

At the trial it appeared that A. D. Wood was a manager of the Producers' Oil Company, Limited, a company engaged in the business of transporting oil by pipe line. On April 11, 1894, the defendant's paper, the Oil City Derrick, published the following article:

### "A PROMISING SCHEME."

"A. D. Wood, the variously notorious young Napoleon of politics and pipe lines, will assembly his small brood at Warren this morning, and together vote on the proposition to turn over the Producers' Oil Company's real pipe line to the refiners and exporters doing business as the fake United States Pipe Line, a concern that exists on paper and subsists on wind. Mr.

Wood has accomplished some surprising things in his day. Without a following in politics, he has set up a political boss; without brains or capital or credit, he has appeared at the head of a gigantic business enterprise requiring liberal bank balances and a large mental endowment. He never yet has succeeded in anything he has undertaken involving the peace and prosperity of the community, for the excellent reason that he is invariably associated with movements that ought not to succeed. We dare say that his scheme to steal a pipe line from the poor producers in order to give it to the opulent refiners and arrogant exporters masquerading as the United States Pipe Line, will fail, as it properly should. It would seem that there is no limit to the greed of this fiend in corporate form, the insatiate monster called United States Pipe Line. Up in McKean county it has Billee Burdick, the boy statesman, running for assembly, and if he is elected the refiners and exporters' pipe line will have a personal representative in the legislature. This is a good place to say much and saw Wood. Saw his official head off."

A. D. Wood resided in the borough of Warren, county of Warren, Pennsylvania, and some time in the month of May, 1894, he made a complaint charging the defendant with criminal libel, and caused a warrant to be issued for his arrest, which was served in Oil City, Venango county, Pennsylvania. Defendant gave bail for his appearance at June term, 1894, in the court of quarter sessions of Warren county. ' An indictment was found against him in the court of quarter sessions of Warren county, and the case was tried at the term commencing the first Monday of December, 1894, and resulted in a verdict of acquittal on the evening of December 6, 1894, just before court adjourned. On the morning of the 7th, Mr. Boyle entered the courthouse, and while waiting for court to convene in order that he might be discharged, he was called into the rear room and taken into custody by the sheriff on the capias issued in this case. Application was immediately made to the court to set aside the service of said capias on the ground of privilege, and a rule to show cause was granted, which rule was afterwards discharged by the court. [1]

The court charged in part as follows:

There is evidence tending to show that he (the defendant) is the editor and publisher of a newspaper called the Oil City Derrick, in which the article appeared; that copies of that paper were received regularly in Warren; that one of the copies which is alleged to have been sent out from the office at Oil City to the agent in Warren, and by him delivered to the subscribers, is presented to you. If you find that this paper is one of the edition published in Oil City, and was so delivered and published by the defendant, then he has published the article within this county.

[The next question is whether or not the article is libelous in character. And this presents the first question of law. It is for the court to read the article and to say whether its terms, on its face, come within the definition of a libel. And I am bound by my duty to say to you, gentlemen, that this article is libelous ; that it has a tendency to defame the character and to lower the reputation of the person about whom it is written ; it has the tendency described in the definition which I have read and also the definition of our act of assembly, and hence it is a libel on its face, and the publisher of the article is liable to the person about whom it is written or published in damages, unless it is privileged—published on a privileged occasion—and he has shown the absence of malice, or the want of malice appears in the evidence.] [2]

[The declaration, which I understand is mislaid and not here, contains certain parenthetical clauses in the quotation of the article, referring it to the plaintiff, and tending to define the article and give its clear meaning. Those are for you. It is for you to say whether A. D. Wood is the party about whom it is written. His name is used here—Is this the same person about whom it is written? If you find that he is, and this article was published in this county concerning Mr. Wood, then I say to you it is a libel, and the plaintiff is entitled to recover some damages, unless something appears in the way of defense.] [3] And as to this the first question is whether or not the article was privileged. You will perhaps require some explanation about that.

The press is free in this county, so is speech. It is perfectly free for any person to write or speak anything that he sees proper. There is no power in the government to restrain him

from so doing, but he does it, under the constitution, subject to his responsibility. It does not relieve him if he publishes a libel, from any sort of responsibility for what he does. There are occasions when it is justifiable and proper for a man to make statements, either verbally, or in writing, or by printing, concerning another, which may tend to blacken his character or to defame him. As an example of that, I may call attention to the case of a person who is a candidate for a public office of trust. . . .

Now the rule which I have spoken of concerning public officers applies to persons acting in a public character or relation. Sometimes an individual not a candidate for office may occupy such a position respecting the public that his conduct and his intentions and character generally become legitimate subjects of public information. . . . But although a person may be a candidate for office, or be occupying a public station, an officer of a corporation, or anything of that sort, and in that character subject to public criticism, he is not so subject to it in his private character or respecting private matters about which the public have no interest.

In this case, gentlemen, there has been some evidence given tending to show that the Producers' Oil Company, which is referred to in the article, was a limited partnership, so called—a joint stock company; that it had a pipe line for the transportation of oil; that it was taking oil from its stockholders and some other people, under some arrangement with them; that Mr. Wood was an officer of that company; that there had been a resolution passed by the managers, of whom Mr. Wood was one, to transfer some of its property, or looking to the transfer of some of its property, to the United States Pipe Line; that that transfer had been enjoined by the court of common pleas of Allegheny county, on the ground that the consent of all the stockholders was necessary; or at least that it would be illegal without such consent, or the consent of a majority of the stockholders, and that this was known to Mr. Boyle. And the attempt is made to justify this publication as privileged, under this evidence.

[I feel bound by my duty to say to you that no occasion or privilege for the publication of such an article as this is disclosed in the evidence. Whether the Producers' Oil Company,

or the Producers & Refiners' Pipe Line were actually common carriers or not; whether, in other words, they were offering to do anything for the public generally, or were merely receiving oil for certain persons with whom they chose to deal; in either case, there is no such occasion of privilege as would justify the publication of an article such as this one which has been read in your hearing. The criticism is not an attack upon Mr. Wood in his character as an officer dealing with the public. It relates to the transaction of business affecting only the stockholders of the company, and in which the public had no concern at all. And the tone of the article is such that it goes outside of any privilege which might be claimed in such a suit as this.

Gentlemen, it follows from this construction that if you find that the article was published by the defendant, you must find for the plaintiff some damages. If you find it was not so published, then you must find for the defendant.] [4] . . .

[Some evidence was given on the part of the plaintiff of statements made by Mr. Boyle concerning the reason for this publication—not of this particular publication, but of other publications in the same direction. Also some evidence of a connection between Mr. Boyle and a company called the Derrick Publishing Company, and the connection of that company with certain other institutions, which are alleged to be rivals to the one with which Mr. Wood was concerned. This is all for you, gentlemen, as bearing all together upon the motive in the mind of Mr. Boyle; and the question whether or not he was actuated by actual ill-will and malice, and by that I mean any ill-will against Mr. Wood, personally; whether it was for mercenary purposes, a desire for gain, or done to gratify somebody else. This is a matter which you will consider in determining the damages.] [5] . . .

On the part of the defendant I am requested to instruct you in the first and third points concerning the character of the article published. They are both answered in the negative; because I have felt it my duty to say to you as a matter of law that this article is libelous. [6]

1. Unless the jury believe that the publication charged in the plaintiff's statement of claim is of a character such as to blacken the reputation of the prosecutor and thereby expose him to public hatred, contempt or ridicule, it is not defamatory and their verdict should be for the defendant.

3. That in determining whether or not an article is defamatory, the words are to be taken in the sense in which they are used and understood by the mass of the people in the locality where the article is published, together with the circumstances surrounding the writer and publisher at the time, taken in connection with the subject-matter of the publication and the circumstances surrounding it at the time.

4. When a private corporation or private company devotes its property or business to a use in which the public have an interest, they, in effect, grant to the public an interest in such use and must to that extent submit to be controlled by the public for the common good, and the acts of its officers, as such officers, are matter proper for public investigation and information. *Answer:* I answer that by saying that I am not called upon to give an opinion as to all the matters stated in the point. But the acts of the officers of public companies, as well as individuals occupying any public station, in the course of their relations with the public, are proper for public investigation and information. [7]

5. If the jury believe that the Producers' Oil Company, Limited, was engaged in receiving, transporting and storing oil in its tanks and through its lines from all oil producers and charging a remuneration therefor, then said company was engaged in a public employment or devoting its property and business to a use in which the public had an interest, and the acts of A. D. Wood, one of the company's officers, was, as such officer, the subject of public investigation and information. *Answer:* The evidence does not justify me in charging you as requested in that point. [8]

9. The plaintiff having introduced no evidence of actual damage, the jury, if it finds for the plaintiff, must give him only nominal damages, unless it finds that there was actual malice or negligence on the part of the defendant. *Answer:* I answer that in the negative, as it is put. You may give the plaintiff damages, substantial damages, although no actual damages have been shown—no actual estimate of the amount given to you,—the article being libelous, if you find it was published as I have stated, and provided that you find from all the evidence in the case that there was an injury to his reputation which justifies it. You may take all the evidence in determining the amount,

and if you find the case is such that the publication of this article has not injured anybody at all; if something were published of a libelous character, just over the line, but about a person of no character, who could not be injured in that way, had a bad reputation, you might possibly give nominal damages —meaning by that very small damages, so small as to really make it contemptuous. Nominal damages, I understand in that sense in this point; and if that is what is meant, I say to you that you are not limited by the fact that the plaintiff has not given you any proof of actual injury, to such damages as that. But you ought not to add any damages by way of punishment, unless from the evidence you are satisfied there was actual malice, actual ill-will, or such gross negligence as amounts to the same thing. Now that you may find, if it exists, and you are satisfied from the article itself, its character and the circumstances surrounding it,—from all the evidence in the case. Or you may find it to be entirely absent, and as you find so you will find in your verdict. [9]

[To sum it all up (I have endeavored to make this case clear to you), I say to you as matter of law, that if the defendant published this article in the county of Warren—that is, if he caused it to be published here, distributed here in his paper, it is in fact libelous, and the law presumes it to be malicious, and there must be some verdict in favor of the plaintiff; the amount of the damages depends on the circumstances which I have gone over—if you find those facts.] [10]

Verdict for plaintiff for $1,000.

The verdict was rendered on October 16, 1895. Before the judgment was entered the plaintiff died, and on December 30, 1895, his death was suggested of record. A rule was then taken to show cause why the judgment should not be arrested. This rule was discharged, and on February 8 judgment was entered by order of the court nunc pro tunc as of the first Monday of December, 1895. [11]   Defendant appealed.

*Errors assigned* were (1) refusal to set aside service of the capias; (2–10) above instructions, quoting them; (11) refusal to arrest the judgment.

*W. M. Lindsey* of *Lindsey & Parmlee*, with him *Allen & Sons, Wilbur & Schnur, Eugene Mullen* and *H. McSweeney*, for

appellant.—The defendant was privileged from arrest: Barton's Case, 3 Pa. C. C. R. 334; Brass v. Vandegrift, 23 W. N. C. 270, Addicks v. Bush, 1 Phila. R. 19; Key v. Jetto, 1 Pitts. 117; Treichler v. Hauck, 1 Leg. Chron. 98; Foreman v. Morrow, 2 Brightly's Dig. 2053.

As the article is very far from being plain and unambiguous, the meaning of the words were for the jury: Hays v. Brierly, 4 Watts, 393; Pittock v. O'Neill, 63 Pa. 253; Jaggard on Torts, vol. 1, p. 499; Vanderlip v. Roe, 23 Pa. 82; Dottarer v. Bushey, 16 Pa. 204; Gosling v. Morgan, 32 Pa. 273; Press Co. v. Stewart, 119 Pa. 584; Bruce v. Reed, 104 Pa. 408; Collins v. Dispatch Publishing Co., 152 Pa. 187; R. R. Co. v. McCurdy, 114 Pa. 554.

It is conceded that the question of privilege is one for the court, that is, whether the occasion is one of privilege or not; but, inasmuch as the meaning of the words in the article and the motives of the writer are for the jury, it is respectfully submitted that, in a case where the occasion is privileged, the question whether or not the character of the article exceeds the limits of privilege is one for the jury: Struthers & Son v. Evening Bulletin, 3 W. N. C. 215; Neeb v. Hope, 111 Pa. 145.

That at common law the action of libel did not survive to the heirs or personal representatives cannot be questioned. It died with the plaintiff, and that such was the law in Pennsylvania in 1824 is shown by the decision of the Supreme Court rendered October 18, 1824, in the case of Stroop v. Swarts, 12 S. & R. 76; Struthers v. Peacock, 3 W. N. C. 517.

The act of assembly of February 24, 1834, P. L. 77, providing that executors and administrators may become parties and prosecute legal proceedings pending in the courts, expressly excepts "action for slander, for libel, and for wrongs done to the person."

*Samuel T. Neil* with him *J. W. Lee* and *Clarence Walker*, for appellee.—Denying privilege of suitor is not reviewable.

The defendant was not entitled to the privilege: 1 Am. & Eng. Ency of Law, 724; Moyer v. Place, 13 Pa. C. C. 163; Conroy v. Pittsburg Times, 139 Pa. 334; Seip v. Deshler, 170 Pa. 334; Collins v. Dispatch Co., 152 Pa. 187.

The character of this publication was for the determination

of the court: Seip v. Deshler, 170 Pa. 334; Hayes v. Press Co., 127 Pa. 648; Moore v. Francis, 121 N. Y. 199; Sparf v. U. S., 156 U. S. 51; Com. v. McManus, 143 Pa. 64.

The publication was not privileged.

This action did not abate upon the death of plaintiff: Stroop v. Swarts, 12 S. & R. 76; Robert's Digest, 377; Palmer v. Cohen, 2 Barn. & Adolph, 966; Murray v. Cooper, 6 S. & R. 126; Griffith v. Ogle, 1 Binn. 172.

OPINION BY MR. JUSTICE GREEN, October 5, 1896:

We are clearly of opinion that in every point of view, and in every way of reading the publication in question, it was plainly and grossly libelous in itself. Nor is there the slightest reason or excuse for the attack upon the plaintiff in the contention now made that he was an official person, engaged in a business of a public character, and therefore the publication was privileged. It was not his official character or the conduct of his official business that was impeached. On the contrary the publication was a coarse, brutal, malevolent and purely personal attack upon the plaintiff in his private, individual and personal capacity. The words used are not in the least degree ambiguous, their meaning is perfectly clear and plain, and they do not require the help of any innuendo. The full proof of this is the mere citation of some of the words of the libel. Thus "Without a following in politics, he has set up a political boss; without brains or capital or credit he has appeared at the head of a gigantic business enterprise requiring liberal bank balances and a large mental endowment." Every word of this is private and . personal only. It is an assertion that the plaintiff, that is, the individual, was a person "without brains," that he was "without credit," and that he was "without capital." There could not be a more personal accusation than is contained in these words. There is nothing official about it. When it was added in the immediately following words and as a part of the same sentence that "he appeared at the head of a gigantic business enterprise requiring liberal bank balances and a large mental endowment," it was clearly implied that he was entirely unfitted for such a position because he was without brains or capital or credit. These deficiencies are of course purely personal and

would, if true, disqualify him as an individual from the occupancy of such a place in the business world.

Another sentence of the article is no better than the last in this respect. " He never yet has succeeded in anything he has undertaken involving the peace and prosperity of the community, for the excellent reason that he is invariably associated with movements that ought not to succeed." That is, the plaintiff, as an individual, was invariably associated with enterprises which did not succeed because they ought not. Whether they were disreputable, or. fraudulent, or immoral makes but little difference. In any view of the words, they, and consequently he, were subject to just reproach and condemnation. If he was a person of that character he was to be despised and condemned by all good citizens and, especially, he was unworthy to be employed in the management of any business enterprise.

Another sentence of the article is still worse: " We dare say that his scheme to steal a pipe line from the poor producers in order to give it to the opulent refiners and arrogant exporters masquerading as the United States Pipe Line, will fail, as it properly should." · Granting that this was not a literal charge of larceny, in that the subject was not a tangible chattel, yet it was an accusation of very gross fraud, practically amounting to an attempt to divest the title of the real owners to a valuable property and give it to others without consideration. In moral character it was as evil an act as the embezzlement of corporate money by a person having it in his custody. It is not necessary to pursue this branch of the discussion. In many of the decided cases the publications adjudged to be libelous were far less offensive than this. Thus in Hayes v. Press Co., Limited, 127 Pa. 642, we held that the following publication was libelous.

## " HOTEL PROPRIETORS EMBARRASSED."

" A judgment was entered by the Third National Bank against J. F. and W. N. Hayes, of the St. George Hotel, on a promissory note dated August 6th, and payable on demand for $1,500." While the mere statement of the entry of a judgment was a matter of public information and appeared upon the records of the courts, the mere use of the word ' embarrassed,' in the same connection, was held to be libelous. The present Chief Justice, delivering the opinion, said, ' Written or printed

words which are injurious to a person in his office, profession, or calling, or which impeach the credit of any merchant or trader, by imputing to him insolvency, or even embarrassment, are libelous. The law carefully guards the credit of merchants and traders. Imputations of their solvency, or suggestions that they are in pecuniary difficulties, etc., are as a general rule actionable : Odgers on Libel, 19, 29, 80, 81, and authorities there cited. . . . The office of an innuendo is to aver the meaning of the language published, but if the common understanding of mankind takes hold of the published words, and at once, without difficulty or doubt, applies a libelous meaning to them, an innuendo is not needed, and if used may be treated as useless surplusage. . . . The publication as a whole, including the headline, was in no sense privileged." If the mere implication from the use of the word " embarrassed," makes a publication libelous, with how much greater force does that conclusion follow from words which directly charge against a citizen that he is without brains, credit or capital ? How much more severely do they impugn his business capacity, and his business standing and character in the community?

In Collins v. Dispatch Publishing Co., 152 Pa. 187, we held that any publication, injurious to the social character of another and not shown to be true, or to have been justifiably made, is actionable as a false and malicious libel.

It is needless to argue the direct application of that principle to the words of the publication in the present case. The words used in the case cited were, " complaints from outside parties were sent to the department, one asking for his dismissal on account of intimacy with a well known young local elocutionist." Of these words we said, " On their face, without more, the words complained of are defamatory and actionable. In the statement they are laid with an innuendo which, if true, intensifies and greatly aggravates their meaning." This is precisely true of the present case. The words used are far more damaging, scandalous and defamatory in themselves, than the words used in the last cited case, and are therefore manifestly libelous in themselves, and the innuendo " greatly aggravates their meaning." Further argument on this subject is superfluous. Other and equally strong cases will be found in Conroy v. Pittsb. Times, 139 Pa. 334; Seip v. Deshler, 170 Pa. 334, and numerous decisions there cited.

It is almost unnecessary to add that no attempt was made by the defendant to prove the truth of the matters contained in the libel, and it is most certainly true that the publication was not privileged. The truth of the innuendoes, and the question of damages, were submitted to the jury with entire correctness. So far as we can see the publication in question was a wanton, malicious and utterly unjustifiable attack upon the personal and business character of the plaintiff, without the least cause or reason. The defendant has much reason to be thankful for the extreme moderation of the verdict. The views we have expressed dispose of the second, third, fourth, fifth, sixth, seventh, eighth, ninth, and tenth assignments of error. They are all dismissed.

It is very doubtful whether a question of privilege in the service of the writ can be considered in error after a trial on the merits. But if it can, the great preponderance of authority is that the defendant in a criminal case is not privileged from arrest on civil process, while attending court, to answer a criminal charge. There are a few contrary decisions in the lower courts but none in this court, nor in any other court of last resort, English or American, to which we have been referred. In the case of Key v. Jetto, 1 Pittsb. Rep. 117, Judge WOODWARD, sitting at nisi prius in 1854, held that the privilege did not extend to defendants in criminal cases. In 1 Am. & Eng. Ency. of Law, p. 724, there is an extensive collection of decisions of both English and American courts of last resort, in all of which it is held that the privilege did not extend to defendants in criminal cases. We see no good reason for departing from the current of authority on this subject. The first assignment is not sustained.

The eleventh assignment raises the question whether judgment could be entered on the verdict, where the plaintiff has died after verdict and before judgment. In Chase v. Hodges, 2 Pa. 48, it was held that the death of the defendant between verdict and judgment, if not more than two terms intervene, cannot be averred for error since the statute of 17 Ch. II. ch. 8; 1 Jas. II. ch. 17, sec. 5. BURNSIDE J., said, " The statute of 17 Charles II. ch. 8, made perpetual by 1 James II., ch. 17, sec. 5, enacts, that when either party dies between verdict and judgment, the death shall not be averred for error, so that the

judgment be had within two terms after verdict." The same ruling was made in Murray v. Cooper, 6 S. & R. 126. The English cases are to the same effect, and all that it is necessary to do is to enter the judgment within the two terms which was done in this case, nunc pro tunc.

The case of Stroop v. Swarts, 12 S. & R. 76, is not in point. There the wife did not die until after the judgment had been arrested for other cause, and hence there never was any judgment in the court below. Here the death of the party between verdict and judgment, under the statute, did not prevent the entry of judgment within the two terms. Hence the record was complete and a valid final judgment was entered in the court below before the appeal was taken. Of course such a judgment could not be reversed on appeal for such a reason. In Griffith v. Ogle, 1 Binn. 172, the situation of the record was precisely as it is here. The action was case for conspiracy. The plaintiff recovered a verdict for $600 in October, 1802. Reasons for a new trial and in arrest of judgment were filed which were overruled in October, 1804. The plaintiff died in March, 1803, and the court below entered judgment on the verdict as of a term in which the plaintiff was living, and this court sustained the judgment.

The eleventh assignment of error is not sustained.

Judgment affirmed.