**Ramos v. Ramos**

C.P. of Monroe County, no. 1021 DR 2004, no. 479 CV 2005.

*Michael Mancuso,* for plaintiff.
*Eduardo Ramos,* pro se.

ZULICK, *J.,* March 24, 2006—These are exceptions filed by Husband and Wife from a master's report and recommendation in divorce. Eduardo L. Ramos (Husband) and Maribel Ramos (Wife) were married on August 11, 2001, and separated on September 4, 2004. They raised two children, Megan Rose Ramos, born on May 23, 1994, and Nikita Ramos, born on October 28, 1996, both of whom are in Wife's primary physical custody, although Husband now contests paternity of Megan.

Wife filed a complaint for divorce on January 21, 2005. A master's hearing was held by Robert C. Lear, Esquire, divorce master, on September 29, 2005. The master filed his report and recommendations on November 22, 2005.

Both Wife and Husband filed timely exceptions. Oral argument was heard on January 3, 2005.

When evaluating the merit of Wife's exceptions to the master's recommendation, the court must first examine the master's report. In Pennsylvania, "a master's report and recommendation, although only advisory, is to be given the fullest consideration particularly on the question of credibility of witnesses, because the master has the opportunity to observe and assess the behavior and demeanor of the parties." *Moran v. Moran,* 839 A.2d 1091, 1095 (Pa. Super. 2003), citing *Simeone v. Simeone,* 380 Pa Super. 37, 50, 551 A.2d 219, 225 (1988). However, "[i]t is advisory only, . . . and the reviewing court is not bound by it and it does not come to the court with any preponderate weight or authority which must be overcome." *Rothrick v. Rothrick,* 765 A.2d 400, 404 (Pa. Super. 2000), citing *Arcure v. Arcure,* 219 Pa. Super. 415, 416, 281 A.2d 694, 695 (1971).

"[A]lthough the master's report is entitled to great weight, it is the responsibility of the court to make the final equitable distribution." *Trembach v. Trembach,* 419 Pa. Super. 80, 84, 615 A.2d 33, 35 (1992), citing *Morschhauser v. Morschhauser,* 357 Pa. Super. 339, 516 A.2d 10 (1986). In addition, the court must keep in mind the legislature's intent "to effectuate economic justice between the parties." *Perlberger v. Perlberger,* 426 Pa. Super. 245, 259, 626 A.2d 1186, 1196 (1993), citing 23 Pa.C.S. §3102(a)(6).

Wife filed one exception to the master's recommendation and Husband filed 14 exceptions. The parties combined some of these exceptions in their briefs filed in support of their exceptions. I will first address Husband's

exceptions to the master's recommendations, since they were filed first in time.

## I. HUSBAND'S EXCEPTIONS

### 1. *Husband Contends That the Divorce Complaint Was Not Properly Served Upon Him*

Wife filed the divorce complaint in this case on January 21, 2005. An affidavit of service of the complaint was filed on February 9, 2005, showing that the complaint was personally served upon Husband on February 7, 2005, by a process server in the Monroe County Courthouse.

Husband filed a responsive pleading entitled "Answer, preliminary objections and counterclaims" on February 17, 2005. In this pleading, he answered the paragraphs of the complaint, then added a paragraph entitled "First Preliminary Objection," and there stated that he had not been properly served with process. He also filed a counterclaim.

Husband, representing himself, failed to follow the applicable rules of civil procedure when he filed this hybrid pleading. The failure to raise the issue of lack of personal jurisdiction by preliminary objection to the complaint constituted a waiver of that defense. *Encelewski v. Associated-East Mortgage Co.,* 262 Pa. Super. 205, 208, 396 A.2d 717, 718 (1978). Here, Husband did not file a separate preliminary objection as required by Pa.R.C.P. 1028(a)(1). He did not praecipe his preliminary objection for argument as required by Monroe County Local Rule 43 J.D.R.C.P. 1028(c), which provides as follows:

*"Rule 1028(c)—Preliminary objections*

"(1) Preliminary objections shall be filed with the prothonotary. At the time of filing preliminary objections

with the prothonotary, the moving party shall also file a praecipe pursuant to Local Rule 208.3(a)(5) to place the matter on the first argument list occurring more than 30 days following the date of filing the preliminary objections.

"(2) Failure to comply with this provision may be sufficient basis for the court to deny the preliminary objections."

I find that Husband's failure to follow state and local rules of procedure resulted in the waiver of his objection to this court's jurisdiction over his person. Husband never brought his objection to the attention of the court for disposition before trial. He fully participated in the litigation, filing an answer and a counterclaim, and attended and participated in the trial before the master.

Even if Husband had properly raised his objection to our court's jurisdiction, his objection was not well-taken. Husband concedes that he was personally served with a copy of the divorce complaint on February 7, 2005. Husband states in his brief that he was ordered out of the marital home by a protection from abuse order on September 13, 2004. This order caused him to move out of Pennsylvania to a residence in New Jersey. He returned to Pennsylvania on February 7, 2005, for a hearing on a petition for contempt filed in that protection from abuse case.

The petition for contempt charged Husband with indirect criminal contempt. "[A]s with those accused [of] other crimes, one charged with indirect criminal contempt is to be provided the safeguards which statute and criminal procedures afford." *Commonwealth v. Baker,* 722 A.2d 718, 720 (Pa. Super. 1998) (en banc).

Husband cites the case of *Crusco v. Strunk Steel Co.,* 365 Pa. 326, 74 A.2d 142 (1950) for the proposition that criminal process may not be used to obtain service upon a defendant in a civil matter. While that was the result reached in the *Crusco* decision, the case does not support Husband's position. In *Crusco,* the plaintiff filed a civil action in Philadelphia County and 12 days later filed a criminal action against the defendant, who resided in Montgomery County. The court found that the plaintiff fraudulently filed the criminal charges for the sole purpose of bringing the defendant to Philadelphia to obtain personal service there. Under these circumstances, the *Crusco* court voided the civil service of process. Before it reached that result, however, the court stated the general rule that persons appearing in court on criminal charges are not immune from service of civil process:

"The question of the legality of service of civil process on a nonresident defendant brought into a county on criminal warrant issued on the information of the same party who had instituted a civil action against that defendant was considered by this court in *Wood v. Boyle,* 177 Pa. 620, 35 A. 853 [55 Am.St.Rep. 747]. There we said [in 177 Pa. at page 632, 35 A. at page 854]: '. . . the great preponderance of authority is that the defendant in a criminal case is not privileged from arrest on civil process while attending court, to answer a criminal charge . . . . In the case of *Key v. Jetto,* 1 Pittsb.R. 117, Judge Woodward, sitting at nisi prius in 1854, held that the privilege did not extend to defendants in criminal cases. . . .' " *Crusco v. Strunk Steel Co.,* 365 Pa. 326, 327-28, 74 A.2d 142, 143 (1950).

Here there was no suggestion that the Commonwealth's petition for contempt filed against Husband was based upon a fraudulent report, nor was there testimony or evidence as to when the report was filed or who made the report. There was no testimony about the result of the criminal contempt prosecution. Under these circumstances, I find that Mr. Ramos was properly served with the divorce complaint.

### 2. *Husband Contends That the Master Improperly Found That the Parties Have Two Minor Children*

Husband objects to the master's finding that the parties have two children. The master found that "[t]here were two children born to the relationship, namely Megan Rose Ramos born May 23, 1994, and Nikita Ramos born October 28, 1996." Master's report, p. 2. Husband's objection to this finding of the master is not specific as to which child (or both) that he refers to. The children both used Mr. Ramos' last name, and he took them as exemptions on his tax return, listing each of them as "child." Plaintiff's exhibit 4.

Neither party presented any testimony as to what children were born of the parties' union or what the children's birth dates were. Wife testified twice that she met Husband in 1996 (NT 37, 63), which was after the date the master found for Megan Ramos' birth. Husband testified that he challenged Megan's paternity when Wife sought support for Megan Rose in a New Jersey support action. (NT 120.) Wife admitted that she committed fraud in New Jersey when she brought Nikita to Megan's paternity test rather than Megan. (NT 121.) The discovery

of this misrepresentation led to Wife dropping her action against Husband for Megan's support. (NT 121.)

There was no question however, that both Megan and Nikita were Mother's children. (NT 120.) There also was no question that both girls lived in the parties' home at all times during the marriage, and while the parties lived together, they were dependents of both parties. After the parties separated, the minor children continued to live with Mother, and Mother provided their parental care.

Husband's exception to the master's finding about Megan's parentage has little relevance to this court's decision. The fact that a parent has dependent children to care for is a factor considered for equitable distribution under the Divorce Code:

"*Section 3502. Equitable distribution of marital property.*

"*(a) General rule.*— . . . Factors which are relevant to the equitable distribution of marital property include the following: . . .

"(11) Whether the party will be serving as the custodian of any dependent minor children." 23 Pa.C.S. §3502.

Husband's parentage of Megan is not critical to my findings because Wife is her parent, and Wife, not Husband, has custody of her now, and for the foreseeable future I find that Wife will be serving as the custodian of her two dependent minor children for equitable distribution purposes.

Custody of minor children is also relevant for purposes of an alimony award:

"*Section 3701. Alimony*

"*(b) Factors relevant.*—In determining whether alimony is necessary and in determining the nature, amount,

duration and manner of payment of alimony, the court shall consider all relevant factors, including: . . .

"(7) the extent to which the earning power, expenses or financial obligations of a party will be affected by reason of serving as the custodian of a minor child." 23 Pa.C.S. §3701.

I find that Wife's earning power, expenses and financial obligations will be affected by reason of serving as the custodian of Megan and Nikita. I further find that due to Husband's challenge of paternity of Megan Rose Ramos, Wife has no child support for her. Husband's exceptions to this finding of the master are denied as not being relevant to equitable distribution or alimony under the Divorce Code.

### 3. Husband Contends the Master Erred in Awarding Wife the Proceeds of the Sale of the Home and Adjacent Lot

Husband purchased a house and lot (lot 75) in A Pocono Country Place Coolbaugh Township on February 7, 2000, before the parties were married, for $61,000. Plaintiff's exhibit 12. He purchased an adjacent vacant lot, lot 74, after the parties' marriage for $5,000 on June 25, 2002. Plaintiff's exhibit 10. The parties had a first mortgage on the property, which was in foreclosure at the time of the master's hearing. Plaintiff's exhibit 14. They also had a second mortgage from the Pennsylvania Housing Finance Agency, plaintiff's exhibit 15, and owed delinquent property owners' association dues.

The parties sold the properties after the master's hearing, and submitted a HUD-1 statement to the master

showing the net proceeds of sale to be $10,139.80. The master awarded this money to Wife, and awarded the marital component of Husband's pension plan with the Bakery and Confectionary Union and the marital component of the TIPS Savings Plan with Kraft Foods to Husband.

The parties' agreement of sale for the properties established a sale price of $96,000. Plaintiff's exhibit 17. They owed more than the original purchase price of lot 75 on the first and second mortgages, the homeowners dues and tax liens Therefore, the master correctly determined that the net proceeds of sale were the marital increase in value of lot 75 and the marital proceeds of lot 74.

The Divorce Code provides that the increase in value of nonmarital property is marital:

"*3501. Definitions*

"(a) General rule.—As used in this chapter, "marital property" means all property acquired by either party during the marriage and the increase in value of any nonmarital property acquired pursuant to paragraphs (1) and (3) as measured and determined under subsection (a.1). However, marital property does not include:

"(1) Property acquired prior to marriage or property acquired in exchange for property acquired prior to the marriage. . . .

"(a.1) Measuring and determining the increase in value of nonmarital property.—The increase in value of any nonmarital property acquired pursuant to subsection (a)(1) and (3) shall be measured from the date of marriage or later acquisition date to either the date of final

separation or the date as close to the hearing on equitable distribution as possible, whichever date results in a lesser increase. Any decrease in value of the nonmarital property of a party shall be offset against any increase in value of the nonmarital property of that party. However, a decrease in value of the nonmarital property of a party shall not be offset against any increase in value of the nonmarital property of the other party or against any other marital property subject to equitable division.

"(b) Presumption.—All real or personal property acquired by either party during the marriage is presumed to be marital property regardless of whether title is held individually or by the parties in some form of co-ownership such as joint tenancy, tenancy in common or tenancy by the entirety. The presumption of marital property is overcome by a showing that the property was acquired by a method listed in subsection (a)."

Husband did not present the court with any evidence to support a different determination about the increase in value of the house. I find no error in the master's award.

### 4. Husband Contends That the Master Erred in Finding That the 1998 Ford Ranger Truck Was Worth $3,175

The master found the value of the 1998 Ford Ranger truck to be $3,175 and awarded it to Husband. The master based his valuation on a Kelley Blue Book valuation in that amount submitted by Wife. (NT 81.) Husband objected to the valuation because he said it was flawed. He claimed his truck was a six cylinder, not a four cylinder and had 118,000 miles, not 75,000 as the valuation

indicated. The master stated he would take Husband's points into consideration. (NT 81.) Husband gave very brief testimony about the vehicle, stating that it had higher mileage and had been in an accident. (NT 145.) Husband gave the master no evidence or opinion of a different valuation of the vehicle.

The master based his finding of value for the truck from the best evidence he had available to him. Had Husband introduced a different value, the master may have considered it. Husband may not now complain that the master should have made a different finding, because there was no other evidence of value available to the master. Husband's exception is denied.

## 5. *Husband's Exception to the Master's Findings That "Plaintiff Was Unable To Present Expert Witness Testimony Concerning a Specific Marital Component in Regards to the Plans" or As to the Real Estate*

The master found that Husband had a pension from the Bakery and Confectionary Union "in possible pay status" of approximately $495 per month and a TIP plan from Kraft Foods with a value on March 31, 2005, of approximately $24,997.65. Master's report, p. 9. The master stated that "a portion of each one of these is marital, though, due to limited resources and total lack of cooperation from the defendant (Husband), plaintiff (Wife) was unable to present expert witness testimony concerning a specific marital component." Master's report, p. 9. The master made a similar finding as to Wife's inability to present evidence as to the parties' contribu-

tions to the purchase and improvement of the real property.

No evidence was presented to the master by either party about what portion of Husband's pension or TIP investment was marital and what was non-marital. The master's comment in the report was an appropriate one, because the retirement investments were Husband's. He could have produced evidence to show the valuation of these assets at the time the parties married and at the time they separated. He did not, and Wife had no access to this information. The master awarded these assets to Husband, who now gets the benefit of both the marital and the non-marital components of these assets, whatever they may be.

The master correctly reported the same thing about the valuation of the parties' real property. Lot 75 was purchased before marriage, but had increased in value. Without valuation testimony from a party, the master was unable to make specific findings about the value of the real estate at the time of marriage and at the time of separation. Lot 75 was purchased on February 7, 2000, and the parties were married on August 11, 2001. The master was aware of the purchase price, the date of separation and the sale of the property, which took place after the last master's hearing. The sale price under the parties' agreement of sale was $96,000. (NT 101.) Using this information, which was all that he had received from Husband and Wife, he divided the marital components of the properties. I find that he achieved economic justice given the information he had to work with. Husband's exception is dismissed.

### 6. Husband Contends That the Master Erred in Finding That "Husband, During the Course of the Proceedings, Expressed No Interest in Reclaiming Anything That Was in the Residence Prior to Sale"

The master found that Husband did not express an interest in reclaiming any personal property that was in the parties' residence before it was sold. As a result, he determined that whatever personal property is now in the possession of Wife shall be hers, and whatever personal property is now in the possession of Husband shall be his.

Husband now raises the fact that in his pretrial memorandum he asked for tools, a computer and garden equipment. Requesting items of property in a pretrial memorandum is one thing and presenting testimony at trial is another. The master and this court must deal with testimony and exhibits in the record of the trial. Here Husband made no mention of this property during his testimony at trial. The master properly distributed this personal property to the party that possessed it in the absence of more particular direction from the evidence presented.

### 7. Husband Objects That the Master Did Not Allocate a Sewer Pump Debt

Husband contends that the master did not allocate an outstanding sewer pump debt. Wife testified that the parties owed money to Koberlein Septic for installation of a grinder pump in their home in 2005. She thought the amount owed was under $3,000. She testified that she did not sign a work order for the pump, and she did not

believe Husband had either. (NT 108.) To the extent this debt exists, Husband's exception is sustained, and the responsibility for payment of the bill is allocated 60 percent to Husband and 40 percent to Wife. The party that pays the bill may seek contribution from the other for repayment of the other party's percentage share of the bill.

### 8. Husband's Objection to the Award of Permanent Alimony to Wife

Husband has filed an exception to the master's recommendation that he pay alimony in the amount of $800 per month to Wife for the rest of her life. "The purpose of alimony is not to reward one party and to punish the other, but rather to ensure that the reasonable needs of the person who is unable to support himself or herself through appropriate employment, are met." *Twilla v. Twilla*, 445 Pa. Super. 86, 90, 664 A.2d 1020, 1022 (1995). (quotation omitted) In determining the nature, amount, duration and manner of payment of alimony, the court must consider all relevant factors, including those statutorily prescribed for at 23 Pa.C.S. §3701, alimony, (b) relevant factors (1)-(17). " 'Alimony is based upon reasonable needs in accordance with the lifestyle and standard of living established by the parties during the marriage, as well as the payor's ability to pay.' *Twilla, supra*, 445 Pa. Super. at 90, 664 A.2d at 1022, quoting *Perlberger v. Perlberger*, 426 Pa. Super. 245, 277-78, 626 A.2d 1186, 1203 (1993), *appeal denied*, 536 Pa. 628, 637 A.2d 289 (1993)." *Isralsky v. Isralsky*, 824 A.2d 1178, 1188 (Pa. Super. 2003).

The purpose of alimony in Pennsylvania is to "effectuate economic justice between the parties." See 23 Pa.C.S. 3102(a)(6), *Legislative findings and intent. Anderson v. Anderson,* 822 A.2d 824, 831 (Pa. Super. 2003). See also, *Teodorski v. Teodorski,* 857 A.2d 194 (Pa. Super. 2004) (alimony following divorce is a secondary remedy and is available only where economic justice and the reasonable needs of the parties cannot be achieved by way of an equitable distribution award and development of an appropriate employable skill).

The master reviewed the Divorce Code factors and recommended that Wife receive permanent alimony after divorce at the rate of $800 per month. The master found that Wife was totally disabled and unable to be employed because she suffered from multiple sclerosis. Neither party presented any medical testimony or medical records, but Wife established that she was receiving Social Security disability benefits due to her illness. The master found that her Social Security disability benefit totaled $756 per month, or $9,072 per year, and that Husband's gross income was $50,000 per year. Wife was 43 years of age at the time of the hearing and Husband was 53 years of age. Wife's symptoms were numbness in various parts of her body and inability to walk more than a few feet. She used a motorized wheelchair to move around and was unable to drive due to loss of peripheral vision. The master found that she was unable to work.

Although a period of alimony is appropriate in this case, I do not choose to follow the master's recommendation to require lifetime alimony for Wife. Rather, I find that economic justice is served by an award of alimony for six years in the amount of $600 per month. In ordering this alimony award, I rely on the factors considered

important by the master, but also put weight on factors he did not rely upon.

The master appropriately focused on Wife's disability and the gap between her disability payments and Husband's income. In addition to the subsections of section 3701(b) that deal with these facts, I have also considered other subsections, including section 3701(b)(5), (6) and (8). This was not a long marriage; the parties married on August 11, 2001 and separated on September 6, 2004. Neither party contributed to the other's education, training or increased earning power. The parties' standard of living during the marriage was a modest one, and they were frequently in arrears in basic household bills.

Although Husband is healthy and has a much better income than Wife's, he does not have a large discretionary income. The master found that he grossed $50,000 per year, so he probably receives between $36,000 and $42,000 in net income per year.[1] Assuming that the net income figure is $39,000, he receives $3,250 net per month. He is paying child support for a son by a previous marriage in the amount of $728 per month. (NT 83.) Wife sought child support for both girls in New Jersey, but withdrew her claim for some or all of that support.[2]

---

1. The parties did not file income and expense statements and the master did not receive any evidence as to Husband's net income.

2. Wife testified that she sued Husband for child support for both daughters in New Jersey. Husband raised a paternity issue as to Megan. On the day Wife was to bring Megan to the testing location, she fraudulently attempted to have Nikita pose as Megan for the test. This was apparently discovered because Wife withdrew her claim for support. The record was not clear as to whether she withdrew her support claim for both girls or just for Megan. (NT 121.)

Should this claim be renewed, Husband will pay Wife this child support in addition to the alimony. Given these obligations, Husband will be on a tight budget in meeting his own living expenses.

This case may be distinguished from other cases where permanent alimony was awarded. The Superior Court approved a permanent alimony award in *Dyer v. Dyer,* 370 Pa. Super. 377, 536 A.2d 453 (1988), where the parties were married for less than two years before they separated, and enjoyed a modest standard of living during the marriage. Wife was disabled and received Social Security disability benefits. However, Mr. Dyer won $2.8 million in the Pennsylvania lottery, which he received in annual installments of approximately $110,000 each. Here, Husband does not have a large income in relation to his expenses.

Other cases awarding permanent alimony may be distinguished because they involved long marriages. *Geyer v. Geyer,* 310 Pa. Super. 456, 456 A.2d 1025 (1983) (42 years); *Schneeman v. Schneeman,* 420 Pa. Super. 65, 615 A.2d 1369 (1992) (22 years); *Verdile v. Verdile,* 370 Pa. Super. 475, 536 A.2d 1364 (1988) (28 years); *Teribery v. Teribery,* 357 Pa. Super. 384, 516 A.2d 33 (1986) (31 years); *Morschhauser v. Morschhauser,* 357 Pa. Super. 339, 516 A.2d 10 (1986) (29 years); *Miller v. Miller,* 352 Pa. Super. 432, 508 A.2d 550 (1986) (30 years); *Pacella v. Pacella,* 342 Pa. Super. 178, 492 A.2d 707 (1985) (15 years).

In *Teodorski v. Teodorski,* 857 A.2d 194 (Pa. Super. 2004), a wife who was completely disabled and receiving Social Security disability payments was denied alimony. This case also involved a shorter marriage lasting

six years. Mr. Teodorski had paid spousal support for almost five years before the divorce.

Based upon my consideration of all the relevant factors, I find that alimony in this case is necessary, but I will adjust the master's recommendation to a shorter period and lower amount.

## II. WIFE'S EXCEPTIONS

### 1. *Wife Objects to the Master's Distribution of the Water and Electric Service Debt to Her*

The master recommended that Wife be responsible to pay a water bill in the amount of $1,300 and an electric bill in the amount of $3,500 for the house she lived in. He assigned an unpaid income tax obligation on Husband's 2003 federal income tax return in the amount of $1,113 to Husband. Wife has objected to having to pay the entire water and electric debt.

These bills were incurred by the parties during their life together as a married couple. Wife's exception is well-taken and these obligations shall be apportioned on the same basis as the sewer pump debt, 60 percent to be paid by Husband and 40 percent to be paid by Wife. However, since Husband is paying the 2003 federal income tax debt of $1,113 by himself, he will get a credit toward these bills in the amount of 40 percent of the tax debt, or $445.

## CONCLUSIONS OF LAW

(1) Wife is entitled to a divorce on indignities grounds, pursuant to 23 Pa.C.S §3301(a)(6).

(2) Husband's eighth and ninth exceptions to the master's recommendations are sustained.

(3) Wife's exception to the master's report is sustained.

(4) In all other respects, the report and recommendations of the master are approved and any other exceptions are denied.

## DECREE

And now, March 24, 2006, it is ordered and decreed that Maribel Ramos, plaintiff, and Eduardo L. Ramos, defendant, are divorced from the bonds of matrimony.

The recommendations of the master for equitable distribution of the parties' marital property and for alimony are approved and made a part of this decree, with the following amendments:

(1) Husband's eighth exception to the master's report is sustained. The debt to Koberlein Septic shall be considered a marital debt. The responsibility for payment of the bill is allocated 60 percent to Husband and 40 percent to Wife. The party that pays the bill may seek contribution from the other for repayment of the other party's percentage share of the bill.

(2) Husband's ninth exception to the master's report is sustained. Husband shall pay alimony to Wife in the amount of $600 per month for six years.

(3) Wife's exception is sustained. The PPL Electric Utilities bill of $3,519.63 and the Pennsylvania American Water bill of $1,344 shall be apportioned on the same basis as the Koberlein Septic debt, 60 percent to be paid by Husband and 40 percent to be paid by Wife. How-

ever, since Husband is paying the 2003 federal income tax debt of $1,113 by himself, he will get a credit toward his share of these bills in the amount of 40 percent of the tax debt, or $445, which Wife will pay in addition to her 40 percent of the bills.

The court retains jurisdiction of any claims raised by the parties to this action for which a final order has not yet been entered.

Any existing spousal support order shall hereafter be deemed an order for alimony pendente lite if any economic claims remain pending.